UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY LINDSEY,

                              Plaintiff,

              – against –

DETECTIVE SEAN BUTLER and DETECTIVE
RICHARD WERNER,

                              Defendants.

**OPINION AND ORDER**
11-cv-9102 (ER)

Ramos, D.J.:

On December 12, 2011, Anthony Lindsey filed this § 1983 action against Detective Sean

Butler and Detective Richard Werner, alleging that Defendants subjected him to excessive force

while he was being detained at a police station by forcibly shaving his face.  Doc. 2.  After trial,

a jury found that Butler, but not Werner, used excessive force against Lindsey—by forcing him

to the floor and dry-shaving his face—and awarded him a total of $67,501 in damages.  Doc.

230-1.  Pending before the Court is Defendants' motion to set aside the jury's punitive damages

awards and for new trial, and Lindsey's motion for declaratory judgment that Detective Butler

used excessive force in violation of his Fourth Amendment rights.  Docs. 229; 232.  For the

reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part, and

Lindsey's motion is DENIED.

## I.    BACKGROUND

### a.  Lindsey's Testimony

In the early morning hours of December 16, 2008, New York City police officers arrested

Lindsey for a suspected robbery—an offense to which he later confessed—and drove him to the

6th Precinct in southwestern Manhattan.  Doc. 221 at 56:15–57:3, 61:20–62:3.  Upon arrival at the police station, Lindsey was searched and photographed.  *Id.* at 57:4–58:24.  Lindsey had facial hair at that time.  *See id.* at 58:25–59:1.  Later that morning, Lindsey was moved to the Manhattan Robbery Squad Building and placed in a holding cell.  *Id.* at 62:10–63:7.  There, another photograph was taken of him.  *Id.* at 63:8–64:16.  Detective Sean Butler and Detective Richard Werner joined Lindsey inside the holding cell and questioned him for a couple hours.  *Id.* at 65:16–22.  During the questioning, Butler asked Lindsey to shave his face, but Lindsey refused, explaining that he could not do so because maintaining facial hair was sacred to his Islamic faith.  Butler subsequently changed the subject.[1]  *Id.* 66:7–67:3.

Approximately one or two hours later, Lindsey asked to use the bathroom, and Butler and Werner escorted him there, with Lindsey in handcuffs.  67:13–68:8.  The bathroom was public, with a few stalls, sinks, and a urinal.  *Id.* at 68:9–10.  Because Lindsey needed to be unhandcuffed to use the bathroom, Butler and Werner joined him inside.  *Id.* at 68:16–20.  While inside the bathroom, Lindsey was again asked by Butler to shave his face.  Again, Lindsey replied:  "No, I'm Muslim."  *Id.* at 68:24–69:4.  After Lindsey finished using the bathroom, Werner asked him:  "[Y]ou sure you don't want to do it?"  And Lindsey again responded that he would not shave.  *Id.*  69:5–10.

Lindsey was then placed back into handcuffs.  *Id.* at 69:11–15.  Lindsey and the Defendants exited the bathroom and entered a hallway with tile flooring.  *Id.* at 69:16–22, 70:14–17.  While walking down the hallway, Butler tripped Lindsey by placing his foot in front of Lindsey's foot and simultaneously shoving him.  *Id.* at 69:25–70:4.  Unable to use his hands to

---

[1] Lindsey testified that he converted to Islam in 1998 and that since then he has not shaved his facial hair because of his religion.  Doc. 221 at 53:19–20, 23–24, 54:10–21, 56:10-14, 106:24–107:14.  Lindsey also acknowledged that he does not follow every tenet of his religion.  *Id.* at 102:8-103:9.

break his fall, Lindsey fell face-first to the tile flooring.  *Id.* at 70:5–13.  When Lindsey attempted to stand, Butler pinned him to the ground, pressing his knee into Lindsey's lower back and his arms against Lindsey's upper back.  *Id.* at 70:10–18.  Werner was watching from in front of Lindsey.  *Id.* at 70:21–22.  Butler then called for additional officers to help keep Lindsey pinned to the floor.  *Id.* at 71:12–15.  A couple of officers responded, got on Lindsey's back, and instructed Lindsey stop resisting.  *See* 72:16–73:5.  At that point, Butler got off of Lindsey and stood beside Werner, in front of Lindsey.  73:14–17.  Once realizing that he would be unable to get to his feet, Lindsey stopped resisting.  *Id.* 73:6–10.

Butler then instructed Werner to shave off Lindsey's facial hair, ordering:  "Shave him." *Id.* 73:18–22.  In response to Butler's command, Lindsey asked:  "[W]hy are you doing that? I'm Muslim."  *Id.* at 73:23–25.  Werner nonetheless proceeded to shave Lindsey with a razor blade, and without shaving cream, soap, or water.  *Id.* at 74:1–12.  During the shaving, Lindsey remained pressed to the ground, but his head was pulled upward so that Werner could carry out the task.  *Id.* at 74:22–75:3.  Lindsey stayed perfectly still so as to avoid getting cut by the blade, which was at times pressed against his throat.  *Id.* 74:16–21.  Once finished, two other officers lifted Lindsey up; Butler then looked at him and said:  "Good."  *Id.* at 76:8–18.  Lindsey never consented to being shaved.  *Id.* at 75:4–6.  While Lindsey did not suffer any injuries from the shaving, he experienced lower back pain afterwards as a result of Butler's knee being pressed against it.  *Id.* at 74:13–18, 75:20–76:4.

Shortly thereafter, Lindsey was placed in a lineup with six other individuals, all of whom, like Lindsey, were clean shaven.  *Id.* at 78:8–79:13, 79:22–81:4.

### b.  Werner's Testimony

Although Lindsey's case was assigned to Butler, on the morning of December 16, 2008, Werner assisted Butler by transporting a prisoner to the Manhattan Robbery Squad Building, being present for the prisoner's interviews,[2] and obtaining "fillers" for an upcoming lineup.[3]  *See* Doc. 223 at 133:19 –135:10.

Werner did not shave Lindsey; nor did he see anyone else shave Lindsey.  He did not force Lindsey to the ground, and he did not see anyone else holding Lindsey to the ground. Werner also testified that Butler was not his boss, and if Butler had instructed him to do something that was wrong, he would not have done it.  *See id.* at 142:25–144:3.

### c.  Butler's Testimony

On December 16, 2008, Detective Butler was assigned to the Manhattan Robbery Squad, where he was investigating a pattern robberies and home invasions. *Id.* at 159:7–159:24.  In the early morning hours that day, Butler heard a radio call describing a robbery that appeared to fit the pattern of robberies he was investigating. *Id.* at 160:19 –161:1.  After learning that officers had made an arrest in connection with the robbery, Butler went to the 6th Precinct, where the suspect, Lindsey, was in custody. *Id.* at 161:2–12.  There, Butler interviewed Lindsey; he subsequently transported Lindsey to the Manhattan Robbery Squad, where he continued interviewing Lindsey with Werner. *Id.* at 161:14–22.  Werner and his partner, Detective Garrity, thereafter assisted Butler by getting fillers for a lineup. *Id.* at 164:23–6.

---

[2] Werner could not recall whether he indeed drove or helped interview Lindsey, or whether it was some other prisoner. *Id.* at 133:18–20.

[3] Werner testified that "fillers" are "basically people that you get to sit in a lineup that are similar to the prisoner." Doc. 223 at 139:1–2.

Butler did not ask Lindsey to shave his face and would not have given a razor to a suspect who was about to enter a lineup without first consulting a supervisor. *Id.* 165:10–12, 165:13–22, 182:6–11.[4] There were multiple other offers present at the Manhattan Robbery Squad that day from whom plaintiff could have procured a razor to shave. *Id.* at 183:15–19. Butler did not use any physical force against Lindsey, witness anyone else use force against Linsey, or direct anyone to shave Lindsey's face. *See id.* at 160:10–16, 166:12–18, 165:23–24, 166:15–20.

### d.  Pretrial Proceedings

On December 12, 2011, Lindsey—while in incarcerated, and proceeding *pro se*—brought this action against Butler and Werner. Doc 2. In his amended complaint, filed on September 3, 2012, Lindsey requested compensatory damages, punitive damages, attorneys' fees, and a declaratory judgment that Defendants violated his constitutional rights. Doc. 37. On August 29, 2014, the Court denied Defendants' motion to dismiss his Fourth Amendment claim on the basis of qualified immunity.[5] Doc. 50.

The parties thereafter commenced what would become six years of discovery. On October 22, 2019, the Court directed that *pro bono* counsel be appointed to represent Lindsey, Doc. 141, and his counsel appeared on December 10, 2019, Doc. 146. On January 4, 2021, the parties reported to the Court that they had concluded discovery. Doc. 155. And on April 27,

---

[4] Defendants argue that Lindsey "asked to shave his own face so that he could avoid being picked out of a lineup," reasoning that there were other police officers at the Manhattan Robbery Squad that day, who could have given him a razor. *Id.* at 201:16–17.

[5] In its August 29, 2014 Order, however, the Court dismissed Lindsey's Eighth Amendment claim, as well as all of the claims against then Police Commissioner Raymond Kelly and the City of New York. Doc. 50. The Court also held that the amended complaint stated a claim under the First Amendment. On September 11, 2014, Butler moved for partial reconsideration, arguing that the Court should have dismissed Lindsey's First Amendment claim on the basis of qualified immunity, which the Court granted on November 5, 2014. Docs. 51, 59.

2021, Defendants advised the Court that they would not be moving for summary judgment. Doc. 164. Accordingly, the case proceeded to trial.[6]

### e.  The Trial

The Court held a jury trial from January 31 to February 2, 2022. *See* Docs. 221; 223. Lindsey's counsel called two witnesses: Lindsey and non-party, Cecilia Parker.[7] At the close of Lindsey's case in chief, defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a)—arguing that Lindsey had not met his burden of showing that Werner used excessive force, and that Defendants were entitled to qualified immunity—which the Court denied. Doc. 221 at 117:11–118:10.

The following day, Defendants Butler and Werner testified, and the case was submitted to the jury. *See* Doc. 223 at 132:10–184:20, 247:19–21. That afternoon, the jury began their deliberations. They were provided with a verdict sheet that contained six questions. Question 1 asked whether Lindsey "prove[d] . . . that either [Butler or Werner] . . . subjected him to excessive force." Doc. 230-1 at 1. Question 2 asked whether Lindsey proved that he suffered compensatory damages. *Id.* Question 3 asked for the dollar amount of compensatory damages against Butler and Werner, respectively. *Id.* at 2. Question 4 asked for the dollar amount of nominal damages; the question further instructed that if the jury found that Lindsey suffered no compensatory damages, then nominal damages must be awarded, but in an amount not greater

---

[6] On January 3, 2022, the parties filed a joint pre-trial statement describing, among other things, the claims and defenses to be tried and the parties' respective claims for relief. Doc 189. Plaintiff stated that he sought a declaratory judgment that Defendants violated his Fourth Amendment rights by using excessive force to shave his facial hair. *Id.* at 12. Defendants only sought "dismissal of plaintiff's remaining claim of excessive force under 42 U.S.C § 1983[.]" *Id.* at 13.

[7] Parker, Lindsey's sister-in-law, testified that Lindsey practiced Islam and he kept facial hair because of his religion. Doc. 221 at 41:14–19, 47:24–48:7. She testified that Lindsey had facial on December 15, 2008, the day before his arrest. *Id.* at 40:23–41:3, 42:8–15, 47:12–20.

than $1.  *Id.* at 2.  Question 5 asked whether Lindsey "proved . . . that the conduct of [Butler or Werner] was motivated by ill will or spite towards [Lindsey], or involved reckless or callous indifference to [Lindsey's] federally protected rights."  *Id.* at 2.  Question 6 instructed that if the jury answered Question 5 affirmatively, it should "state the dollar amount of punitive damages that [Lindsey] should be awarded against [Butler and Werner, respectively]." [8]  *Id.* at 3.

During deliberations, the jury sent out several notes.  One of the jury's notes contained two questions.  The first question concerned Question 1 of the verdict sheet:  "Clarification on 'subjected him' (omission?  themselves or ordered someone else?)"  Doc. 230-3.  The Court addressed the jury's question by asking it to "further refine the question so that [the Court could have] a better opportunity to address [its] specific concern."  *Id.* at 263:3–8.

The second question concerned Question 6 of the verdict sheet:  "[D]etermination of damage amount[.]"  After the parties and the Court discussed the inquiry, the Court informed the jury that "we really look to you.  There is no formula[;] there is no calculation.  We look to you and your collective wisdom and judgment in determining what amount makes sense, if you determine that a punitive damages award is appropriate."  *Id.* at 261:3–9.  The Court then reminded the jury that "punitive damages looks at the severity of conduct and the need to deter others from engaging in similar conduct."  *See id.* at 261:10–262:20.

Thereafter, the jury submitted another note, clarifying its initial question regarding the meaning of "subject to" in Question 1 of the verdict sheet.  The note stated:

---

[8] On the subject of punitive damages, the Court provided the jury the following instructions in its jury charge: "Plaintiff has the burden of proving by a preponderance of the evidence that the defendant acted maliciously or wantonly with regard to his rights.  If you find by a preponderance of the evidence that a defendant has acted with malicious intent to violate plaintiff's federal rights or unlawfully injure him, or if you find that a defendant acted with a callous or a reckless disregard of his rights, then you may award punitive damages."  Doc. 223 at 232:10–12; *see also id.* at 232:22–233:3 ("[Y]ou should consider whether the defendant may be adequately punished by an award of actual damages only"); *id.* at 233:3–7 ("You should also consider whether actual damages standing alone are likely to deter or prevent the defendant from again committing any wrongful acts he may have committed or whether punitive damages are necessary to provide deterrence.").

Q1 – definition of "subject to"

- Did the defendants commit the act
- Did the defendants order others to perform excessive force?
- Did the defendants allow this to happen –

Is there a hierarchy to these questions as seen by the law; if so, what is it?
How does the law define "subjected to?"  Is there a statute?

Doc. 230-4.  In response, the Court advised the jury that "to 'subject to' is to cause or force someone or something to experience something harmful, unpleasant, et cetera.  In the context of this case, defendants subjected plaintiff to excessive force if that defendant was personally involved in, or directly participated in, the application of excessive force."  Doc. 225 at 284:21–285:18.  As to the three bulleted scenarios listed in the jury's note, the Court informed the jury that it would not provide answers, as questions of fact fall within the purview of the jury.  *Id.* at 285:19–22.  As to the second and third questions, regarding whether there is a hierarchy to the three bulleted scenarios, or a statute defining "subjected to," the Court informed the jury that the answer is "no."  *Id.* at 285:23–286:6.[9]

Deliberations concluded on February 2, 2022, and the jury rendered a verdict in Lindsey's favor.  *Id.* 295:13–298:6.  In response to Question 1 of the verdict sheet, the jury found that Butler—but not Warner—subjected Lindsey to excessive force.  *Id.* at 1.  In response to Questions 2, 3, and 4, the jury awarded Lindsey no compensatory damages but $1 in nominal damages.  *Id.* at 1–2.  In response to Question 5, the jury found that Lindsey proved by a preponderance of the evidence that both Defendants' conduct was either motivated by ill will or

---

[9] During the course of deliberations, the jury sent back two additional notes.  The first asked (1) to clarify the date of a photograph of the line up, and (2) whether Lindsey admitted to committing the robbery.  Doc. 230-2.  The Court confirmed the date of the photograph and, with respect to the second question, responded that "there was testimony during the course of the trial that Mr. Lindsey indicated that he did admit to committing a robbery while being questioned by [] Butler after his arrest but before the lineup."  Doc. 223 at 251:17–252:6.  The second note requested excerpts of trial testimony from Lindsey and Butler, as well as the entirety of Werner's testimony.  Doc. 230-5.

spite towards Lindsey or involved reckless or callous indifference to his federally protected

rights. *Id.* at 2. Lastly, in response to Question 6, the jury awarded a total of $67,500 in punitive

damages, with $50,000 against Butler and $17,500 against Werner.[10]  *Id.* at 3.

### f.  Post-Trial Motions

At the close of trial, Defendants moved to set aside the verdict as contrary to the weight

of evidence and excessive.  Doc. 225 at 299:18–19.  Defendants also maintained that the verdict

"is inconsistent," arguing:

> [a]s to Question No. 1, [the jury] found that Plaintiff did not prove that Richard Werner
> subjected him to excessive force and yet they did award punitive[ damages], so that
> would be inconsistent.  [W]e ask that the Court wait to enter judgment until such time as
> the parties can brief the issue, if the Court requires.

*Id.* 299:20–300:1.  The Court responded that it would require motion practice on the issue.

Lindsey's counsel subsequently stated that they would be open to discussing with the Court if

there was anything further to be done to further inquire into what the jury was thinking.  *Id.* at

300:7–9.  In other words, to ask the jury to continue its deliberations.  The Court replied that it

would not inquire into the jury's thinking, noting that jurors had "worked hard[,] . . . asked

pointed questions[, and] . . . appeared to be an attentive and bright lot."  *Id.* at 300: 10–14.  While

the Court "[had] some questions about the totality of the verdict, [it] could not say that it [was]

completely irrational or contradictory."  *Id.* at 300:14–17.

On March 25, 2022, Defendants filed a motion (1) to vacate the punitive damages award

against Werner as inconsistent with the verdict; (2) for a new trial, pursuant to F.R.C.P. 59,

because the jury's verdict was an improper compromise; and (3) to set aside or remit the punitive

damages against both Defendants as excessive.  That same day, Lindsey filed a motion for

---

[10] After the jury rendered its verdict, Defendants stated that they intended to file a motion to set aside the verdict as
contrary to the weight of the evidence, excessive, and inconsistent but did not mention Lindsey's request for
declaratory judgment.  Doc. 225 at 299:13–300:3.

declaratory judgment that Butler used excessive force against him in violation of his Fourth

Amendment rights.  Doc. 232.

## II.   DISCUSSION

### a.  Inconsistency of the Verdict

"[W]hen the jury's findings appear to be inconsistent with each other, the Seventh

Amendment requires that if there is a view of the case which makes the jury's answers . . .

consistent, the court must adopt that view[.]"  *Georgia-Pacific Corp.*, 1997 WL 217586 at *4

(quoting *Auwood v. Harry Brandt Booking Office. Inc.,* 850 F.2d 884, 890 (2d Cir. 1988)).  In

other words, "'if there is any way to view a case that makes the jury's answers to the special

verdict form consistent with one another, the court must resolve the answers that way even if the

interpretation is strained.'"  *Ebrahem v. Coach Leasing Inc.*, 12 Civ. 8253 (SAS), 2013 WL

5664990, at * 2 (S.D.N.Y. Oct. 17, 2013) (quoting *McGuire v. Russell Miller Inc.,* 1 F.3d 1306,

1311 (2d Cir. 1993)).  Additionally, in determining whether purportedly inconsistent verdicts can

be harmonized, courts "should refer to the entire case and not just the answers themselves."

*McGuire*, 1 F.3d at 1311.

If, however, the findings of a jury cannot consistently be resolved, a new trial may be

appropriate.  *See, e.g.*, *Georgia-Pacific Corp. v. GAF Roofing Mfg. Corp.*, 93 Civ. 5125 (RPP),

1997 WL 217586, at *3 (S.D.N.Y. May 1, 1997) (citations omitted); *see also Stephenson* v. Doe,

332 F.3d 68 (2d. Cir. 2003) ("If we are unable to harmonize the jury's findings, we must vacate

the judgment and order a new trial.") (quoting *Harris v. Niagara Mohawk Power Corp.*, 252

F.3d 592, 598 (2d. Cir. 2001) (internal quotation marks omitted); 9B Fed. Prac. & Proc. Civ. §

2510, *The Return of Verdicts and the Entry of Judgment* (West 3d ed. 2022) ("If the jury's

answers are inconsistent with each other even when the presiding judge views them in the most

generous way to avoid such a conclusion, a new trial under Rule 59(a) ordinarily is the proper

pathway for the trial judge to follow and may be the required course, as numerous federal district

courts and courts of appeal have concluded." (collecting cases)).  A new trial, however, is not the

only available remedy.

In lieu of a new trial, a court may choose to resubmit the questions to the jury.  *Id.*

("When it is feasible and thought appropriate, the trial judge may ask the jury to reconsider its

verdict in an attempt to remove the inconsistency.").[11]  Or, in the alternative, a court may choose

to vacate a damages award.  In *Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 242–45 (E.D.N.Y.

2014), for example, a jury found for the plaintiff on an unjust enrichment claim and awarded the

plaintiff $0 in monetary damages, $1 in nominal damages, and $166,025 in punitive damages.  In

reviewing verdict and damages awards, the Court explained that to support an unjust enrichment

claim, the benefit to the defendant must be "specific and direct."  *Id.* at 248 (internal citations

and quotation marks omitted).  At trial, the core of the plaintiff's unjust enrichment claim was

that the defendant solicited the plaintiff to invest in a Ponzi scheme and, as a result, the

defendant received commissions.  *Id.* at 243.   However, the court explained that there were

problems with the plaintiff's theory at the trial—namely, that there was conflicting testimony

regarding whether the commissions resulted *directly* from the defendant's soliciting the

plaintiff's investments.  *Id.* at 249.  Accordingly, the court found that the jury's decision to award

the plaintiff $0 in monetary damages and $1 in nominal damages "strongly suggest[ed] that the

[p]laintiff failed to prove that the [d]efendant received any commissions from the [p]laintiff's

investments . . . [and that w]ithout any proof of a direct . . . benefit to the [d]efendant, the jury's

verdict . . . [could] not be sustained."  *Id.* at 249.  The court therefore vacated the jury's unjust

---

[11] As noted, the Court, here, declined to do so at the close of trial.

enrichment finding, entered judgment for the defendant on that claim, and vacated the jury's awards of nominal and punitive damages.   *Id.*

Here, Defendants argue that the jury's answer to Question 1 of the verdict sheet—the finding that Werner did not use excessive force—is inconsistent with awarding $17,500 in punitive damages against him.   Defendants reason that punitive damages must be premised on a "a finding that the plaintiff's rights have been violated" by a defendant's conduct.   *See Vasbinder v. Ambach*, 926 F.2d 1333, 1342 (2d Cir. 1991).   And, here, the jury found that Werner committed no such violation.   Lindsey does not contest the legal premise that a punitive damages award must be predicated on rights-violating conduct, but instead posits that the jury *necessarily* found that Werner violated Lindsey's constitutional rights.   Specifically, Lindsey argues that the Court's jury instructions on punitive damages made clear that the jury could only award punitive damages if it found by a preponderance of the evidence that Werner violated his constitutional rights.   Doc. 223 at 232:10–12 ("If you find by a preponderance of the evidence that a defendant has acted with malicious intent to violate plaintiff's federal rights or unlawfully injure him, or if you find that a defendant acted with a callous or a reckless disregard of his rights, then you may award punitive damages.") (emphasis added); *see also id.* at 232:22–233:3, 233:3–7.

The question before the Court is therefore whether the jury's punitive damages award—predicated on the finding that Werner violated Lindsey's constitutional rights—is consistent with its finding that Werner did *not* use excessive force.   Put differently:  could the jury have found that Werner violated Lindsey's rights in some way other than using excessive force?[12]   The answer is no.   The sole question before the jury was whether Defendants subjected Lindsey to excessive force in violation of his Fourth Amendment rights.   A punitive damages award against

---

[12] The Court notes that Lindsey's First Amendment claim was dismissed pre-trial and that Lindsey did not allege a failure to intervene claim.   *See* Docs. 51, 59.

Werner could therefore *only* be grounded in a finding that he used excessive force.  The verdict is therefore unavoidably inconsistent.  To remedy this problem, the Court, like the court in *Legurnic*, grants Defendants' request for vacatur of the $17,500 punitive damages award against Werner.  This remedy brings consistency to the verdict while leaving intact the balance of the jury's findings of fact.

### b.  Improper Compromise Requiring New Trial

#### i.  Standard

Pursuant to Rule 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  However, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Snyder v. N.Y. S. Educ. Dep't*, 486 F. App'x 176, 177 (2d Cir. 2012) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)); *see also Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) ("[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice[.]" (internal quotation marks and citations omitted)).  Additionally, caselaw makes clear that "[c]ourts are not free to. . . set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."  *Medina v. Donaldson*, No. 10 Civ. 5922 (VMS), 2014 WL 1010951, at *14 (E.D.N.Y. Mar. 14, 2014) (internal quotation marks and citation omitted).

"In order for a district court to grant a new trial on jury compromise grounds, 'the record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict.'"

*In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011)

(quoting *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 415 (2d Cir. 1958)).  "[T]he inference

of compromise stems from inconsistency between the verdict and the facts adduced at trial."

*Ajax Hardware Mfg. Corp. v. Indus. Plants Corp.*, 569 F.2d 181, 184 (2d Cir. 1977) (internal

quotation marks and citations omitted).  In other words, the record must show that the jury

"reach[ed] agreement by means other than a conscientious examination of the evidence."

*Maher*, 253 F.2d 416–17.  Courts, however, "should not grant a new trial in circumstances

where, 'while a compromise may have occurred, there is an equally reasonable and perhaps even

better explanation [of the jury's verdict] which involves no jury misconduct.'"  *In re Vivendi*

*Universal*, 765 F. Supp. 2d at 574 (quoting *Ajax*, 569 F.2d at 184); *see also Lewis v. City of New*

*York*, 689 F. Supp. 2d 417, 426 (E.D.N.Y. 2010) (same).  "If new trials were required whenever

a possibility exists that jurors with conflicting views had compromised, trial would become a

hopeless and ineffectual way to settle disputes."  *Aczel v. Labonia*, 584 F.3d 52, 60 (2d Cir.

2009).

A court may infer that a verdict is a compromise "where damages are awarded in an

amount inconsistent with the theory of liability offered at trial together with other indicia such as

a close question of liability." *Atkins v. New York City,* 143 F.3d 100, 104 (2d Cir. 1998);

*Diamond D Enterprises USA, Inc. v. Steinsvaag,* 979 F.2d 14, 17 (2d Cir. 1992) ("An inadequate

damages award, standing alone, does not indicate a compromise among jurors.") (citations

omitted).

### ii.  Analysis

Defendants argue that a new trial is necessary because the record does not support a

finding of liability against them.  First, they argue that the jury reached an improper compromise

14

by holding Butler, but not Werner, liable for excessive force, since the sole theory of liability advanced by Lindsey at trial was that the Defendants used excessive force *together*, acting in concert.  In Defendants' view, finding Butler liable for excessive force, but not Werner, shows that the jury improperly and selectively accepted only a portion of Lindsey's testimony and ignored Defendants' testimony denying use of excessive force.  Doc. 231 at 19–20.

The Court, however, finds the jury's verdict consistent with the version of events offered by Lindsey at trial.  Lindsey testified that Butler subjected him to excessive force by tripping him, pushing him on the ground, holding him down with his knee on his back, calling over other officers to help keep him down, and then directing Werner to shave Lindsey's face.  *See* Doc. 221 at 69:25–71; 72:9–17; 73:11–74:4; 74:22–75:3.  Lindsey testified that Werner was not the one that pushed him to the ground or held him there; according to Lindsey, Werner was on the sidelines acted only after Butler instructed him to shave Lindsey's face.  *See id*. at 71:19–22.  Finding that Butler, but not Warner, acted with excessive force is thus reasonable and consistent with the facts adduced at trial.

Furthermore, the Court declines to set aside the verdict because the jury believed Lindsey and not the Defendants.  Caselaw makes clear that "where [a jury's] resolution of . . . issues depended on assessment of the credibility of . . . witness[es], it is proper for the court to refrain from setting aside the verdict and granting a new trial."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir. 2012); *see also DLC Mgmt.*, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.")*.*  Accordingly, the Court declines to replace its determination as to the credibility of the witnesses with that of the jury.

Defendants also argue that the duration of the jury's deliberations (which spanned over two days) paired with the content of its notes (*e.g.*, asking whether "allowing" excessive force to

occur amounts to "subject[ing]" someone to excessive force) further demonstrates a compromise. *See* Doc. 231 at 17– 22.  The Court also disagrees with this contention.  Nothing about the jury's deliberations suggests that they had a difficult time reaching a verdict.  And even if they did struggle to reach unanimity, that does not suggest that they compromised to do so; indeed, asking questions and proceeding deliberately just as well signals that the jury took care to be thorough. *See* Doc. 225 at 300:12–14 (the Court noting that the jury "asked pointed questions," were hard-working, and "appeared to be an attentive and bright lot").  Importantly, Defendants cite no authority—and nor has the Court found any—for the proposition that the length of a jury deliberations, or the subject matter or number of its questions, suggests that a verdict is the product of a compromise.  This is especially true where, as here, the jury selection, trial, and deliberations were completed in just three days.  Accordingly, the Court finds Defendants' argument without merit.

Lastly, none of the cases cited by Defendants are analogous.  Here, the jury never indicated that it was deadlocked in any of its notes.  *Cf. Mekdeci v. Merrell Nat'l Labs.,* 711 F.2d 1510, 1515 (11th Cir. 1983) (relying on "the announcement of a deadlock soon after the judge denied the request" to "explain their verdict," to conclude that "the jurors could not reach an agreement on the substantive issues").  The jury also did not "sudden[ly] arriv[e] at unanimity, when just a few hours before it was still struggling with an apparently close issue of liability." *Skinner v. Total Petroleum, Inc.,* 859 F.2d 1439, 1446 (10th Cir. 1988).  Nor did it "attempt to qualify its verdict in any manner." *Burger King Corp. v. Mason,* 710 F.2d 1480, 1488 (11th Cir. 1983).  Additionally, every opinion cited by Defendants that *actually* found a compromise included a finding of inadequate damages:  an element entirely missing here.  *See* Doc. 231 at 18 (citing *Skinner*, 859 F.2d at 1445–46 (10th Cir. 1988) (finding damages inadequate); *Mekdeci,*

711 F.2d 1510, 1514–15 (same); *Phav v. Trueblood, Inc.,* 915 F.2d 764, 768–69 (1st Cir. 1990)

(same); *Burger King Corp.,* 710 F.2d at 1487–88 (11th Cir. 1983) (same); *Diamond D*

*Enterprises USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17–18 (2d Cir. 1992)  (affirming the district

court's grant of a partial new trial (only as to damages), and noting that "there was no indicia of a

jury compromise *other than the low damages award*") (emphasis added)).

　　　For the reasons set forth, the Court finds that the record supports the jury's verdict.

**　　c.　Excessiveness of Punitive Damages Award**

**　　　i.　Standard**

　　　In evaluating whether the punitive damages award is excessive, courts assess whether

"the jury's award is so high as to shock the judicial conscience and constitute a denial of justice."

*Payne v. Jones*, 711 F.3d 85, 96 (2d Cir. 2013) (internal quotation marks and citation omitted).

Courts may also consider the "guideposts" set forth in the in *BMW of North America, Inc. v.*

*Gore*, 517 U.S. 559 (1996) on the "different but closely related question" of "the excessiveness

of a *state court* punitive damages award[.]"  *Payne*, F.3d at 96–97.  The guideposts include:  (1)

degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to

the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the

misconduct in question."  *Id.* at 101 (citing *Gore*, 517 U.S. at 574 –75).

**　　　ii.　Analysis**

　　　Here, Defendants argue that the punitive award against both Defendants in the amount of

$67,500—now $50,000, having vacated the $17,500 award against Werner—should be remitted

or set aside as excessive, unsupported by the record, and because it shocks the conscience.  Doc.

231 at 24.

The first and "'[p]erhaps most important indicium of the reasonableness of a punitive damages award,'" degree of reprehensibility, weighs heavily in favor of upholding the jury's award here. *Payne*, 711 F.3d at 101 (quoting *Gore*, 517 U.S. at 575); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (same).  Lindsey testified that Defendants asked him several times if he would shave his face and he that he said no every time because it was against his religious beliefs.[13]  Doc. 221 at 66:7–24, 69:1–10.  As determined by the jury, Defendants nonetheless shaved him by forcing him to the ground and holding him down. *Id.* at 69:11–70:13, 75:4–74:6.

The next guidepost advises courts to consider the relationship between the punitive damages award and the compensatory damages award.  Generally, a "four-to-one ratio of punitive to compensatory damages awarded is 'close to the line of constitutional impropriety.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014).  Here, the jury awarded Lindsey no compensatory damages and only one dollar in nominal damages.  Defendants therefore argue that this factor renders the award impermissibly excessive.  The Court, however, disagrees.

In § 1983 cases—where damages are often nominal, but where the conduct warrants punishment—the Supreme Court and Second Circuit have routinely held that a ratio approach is "not the best tool" since the ratio to any "appreciable" punitive damages award will always "appear excessive by this measure." *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996); *see also Gore*, 517 U.S. at 582–83 (emphasizing the impossibility of making any bright-line test, because the propriety of the ratio can vary with the facts of each case); *Stolberg v. Members of Board of Trustees for State Colleges of State of Connecticut*, 474 F.2d 485, 489 (2d Cir. 1973) ("[P]unitive

---

[13] Whether or not Lindsey follows *every* tenet of his religion does not, as Defendants contend, *see* Doc. 251 at 9, undercut his clearly communicated belief that maintaining a beard was sacred to him in his practice of Islam.

damages may, in an appropriate case, be awarded for violation of 42 U.S.C. § 1983, even in the absence of actual damages."); *Milfort v. Prevete*, 3 F. Supp. 3d 14, 25–26 (E.D.N.Y. 2014) (declining to rely on the "exceptionally high ratios of this case" to remit the damages award because "[t]he fact that the jury found that no compensatory damages were justified does not nullify their finding that punitive damages were," because "the conduct itself was malicious and entailed an abuse of state power"); *King v. Macri*, 800 F. Supp. 1157, 1162–63 (S.D.N.Y. 1992) (collecting cases) ("[T]he failure to award compensatory damages is not dispositive of the question whether a plaintiff has suffered a deprivation of his constitutional rights."). Accordingly, the Court declines to reduce the award.

Lastly, the Court finds that the punitive damages award falls well within the range of analogous awards for police misconduct, including in cases, like this one, that did not involve serious physical injuries. *See, e.g.*, *O'Neill v. Krzeminski*, 839 F.2d 9, 13–14 (2d Cir. 1988) (upholding $185,000 in total in punitive awards for excessive force where "[t]he plaintiff, while handcuffed and unable to defend himself, was struck" in the head by police officers, which resulted in no permanent physical disability); *King*, 800 F. Supp. at 1160, 1163 (finding punitive damages awards of $75,00 and $5,000 against police officers involved in a "scuffle" with the plaintiff was not excessive, even though the plaintiff "did not suffer actual injuries"); *Milfort*, 3 F. Supp. 3d at 26 (evaluating $40,000 punitive damages award for false arrest claim, where the jury explicitly found that the plaintiff" was not subject to excessive force").

For these reasons, the Court denies Defendants' request to vacate the punitive damages award.

### d.  Declaratory Judgment

### i.   Standard[14]

The Declaratory Judgment Act provides that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.  28 U.S.C. § 2201(a) (emphasis added).

In other words, the statute requires (1) an actual controversy within the Court's jurisdiction; (2) a pleading requesting a declaratory judgment; and (3) an interested party seeking a declaration. Here, Defendants oppose Lindsey's motion solely on the basis that there is no actual controversy.

The "actual controversy" requirement is coextensive with the "case" or "controversy" requirement in Article III, Section 2, of the Constitution.  *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40, (1937) (explaining that "cases of actual controversy" refers to "the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense").  In other words, the "actual controversy" requirement "does not impose a higher threshold for justiciability than the basic Article III requirement that federal courts shall only decide cases and controversies."  *East/West Venture v. Wurmfeld Assocs., P.C.*, 722 F. Supp. 1064, 1067 (S.D.N.Y. 1989).

To establish an actual case or controversy, "a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury."  *Rolle v. Girardi*, 689 Fed. Appx. 64, 65 (2d Cir.

---

[14] The Court declines to find, as Lindsey requests, that Defendants waived the right to resist his motion for declaratory judgment by failing to expressly indicate as such in the joint pre-trial statement.  *See* Doc. 189 at 13.  As Defendants note, they have contested the factual basis for the declaratory judgment sought by Lindsey since the onset of litigation.  *See* Doc. 243 at 8.  Moreover, the Court must consider whether it is authorized by the Declaratory Judgment Act to provide the relief requested by Lindsey.

2017) (quoting *Pulliam v. Allen*, 466 U.S. 522, 541–43 (1984)) (internal quotation marks omitted).[15]

### ii.  Analysis

Defendants argue that Lindsey's motion for declaratory judgment should be dismissed because the case and controversy has concluded, and there is no evidence that he will again be subject to harm at the hands of Defendants in the future.  The Court agrees.

Binding Second Circuit precedent makes clear that a plaintiff "cannot rely on past injury to satisfy the injury requirement [of establishing an actual case or controversy] but must show a likelihood that he or she will be injured in the future."  *Girardi*, 689 Fed. Appx. 64 (affirming the district court's decision that a plaintiff who was allegedly removed from the courtroom by a federal judge in violation of his constitutional rights failed to demonstrate that there was a likelihood of him appearing before that same judge in the future and that the judge would again unlawfully order him to leave); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (stating the same principle) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)).  As Defendants correctly note, Lindsey, neither in his complaint nor at trial, suggested a likelihood of being harmed by Defendants in a similar manner in the future.  *See* Doc. 243 at 6–8.  The cases relied upon by Lindsey—only one of which is binding—do not compel a different outcome.

---

[15] Lindsey argues that "[i]n order to decide whether to entertain" a motion for declaratory relief, the Second Circuit has "instructed district courts to ask:  (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969).  Satisfying these elements does not, however, enable Lindsey to overcome the threshold question—with which the Court here concerns itself—of whether there exists an actual case or controversy to permit the Court to grant declaratory relief.

For example, Lindsey cites *Henrietta D. v. Bloomberg* for the proposition that a court may sustain an action for declaratory judgment, even when a plaintiff has failed to show any likelihood of future injury.  331 F.3d 261, 290 (2d. Cir. 2003).  There, residents of the City of New York with HIV-related illnesses brought a class action suit against the City for unlawfully denying them meaningful access to public assistance programs, benefits, and services.  *See generally id.*  After the district court granted declaratory relief, the City appealed, arguing that plaintiffs offered evidence only "about past harms and did not address potential future violations."  *Id.* at 290.  While the Second Circuit affirmed the district court's holding, it did *not*, as Lindsey suggests, treat evidence of future harm as unnecessary to sustain an action for declaratory judgment.  Rather, the court explained that the plaintiffs *had* introduced evidence that showed a likelihood of the City's potential future violations.  *Id.* (explaining that the defendants were ignoring the fact that a senior official acknowledged the government's continued non-compliance with the relevant law).  Lindsey has set forth no such evidence here.

Furthermore, *Phoenix Mut. Life Ins. Co. v. Seafarers Officers & Employees Pension Plan*, 128 F.R.D. 25 (E.D.N.Y. 1989) is not analogous.  The case involved one party who refused to make payments pursuant to binding lease agreements and a counter-party seeking declaratory judgment on the legal consequences of that non-payment.  *See id.* at 28.  In finding the moving party entitled to declaratory relief, the court made clear that "declaration [was] not being sought on the legal consequences of some act that may or may not occur."  *Id.*  The non-moving party was *actively* refusing to pay, and the harm done unto the moving party was *ongoing*.  By contrast, here, the incident has concluded, and the wrongful conduct is no longer continuing. What's more, relevant to that court's holding was that "declaratory judgment [would] alleviate the uncertainty surrounding the legal meaning of the factual circumstances that have already

occurred." *Id.*  Here, by contrast, there is no such uncertainty.  The jury's verdict is clear.
Critically, Lindsey points to no case where a litigant has successfully obtained declaratory
judgment merely for the purpose of restating what a jury has already determined.

While the Court acknowledges the reasons for why Lindsey seeks declaratory judgment
(*i.e.*, for "significant psychological relief" and in order to obtain a "succinct summary of the
incident that would assist him in" his efforts to obtain collateral post-conviction relief in New
York state courts), the Court cannot find a likelihood of future harm where one has not once been
alleged to exist.[16]  Doc. 252 at 14.  Accordingly, Lindsey's motion is denied.[17]

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to set aside the punitive damages award
and for new trial is GRANTED in part and DENIED in part.  Specifically, Defendants' motion to
vacate the $17,500 punitive damages award against Werner is granted, while the balance of
Defendants' motion is denied.  Furthermore, Lindsey's motion for declaratory judgment is
DENIED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 229 and
232, and enter judgment in favor of Plaintiff.

It is SO ORDERED.

---

[16] In *Salomon Bros. Inc. v. Carey*, 556 F. Supp. 499, 501 (S.D.N.Y. 1983), the other case relied upon by Lindsey for
the proposition that courts routinely issue declaratory judgments on past conduct, there existed an ongoing
controversy with respect to the fiduciary duties owned by [the plaintiff to the defendant]."  As noted, there is no
ongoing controversy between Defendants and Lindsey.

[17] Lindsey's request for the Court to include in this order his proposed statement, *see* Doc. 234, without applying the
label of 'declaratory judgment' to it is also denied.  Lindsey proposes this alternative as a way to resolve any
concern about the Court somehow declaring the party's rights absent a case or controversy.  *See* 252 at 15.  But
Lindsey does not provide any legal basis or precedent for this request.  Accordingly, it is denied.

Dated:   December 22, 2022
         New York, New York

_____

Edgardo Ramos, U.S.D.J.